ORDER AFFIRMING REPORTS AND RECOMMENDATIONS RE: CRIME/FRAUD EXCEPTION
 

 GOLD, District Judge.
 

 I. Introduction
 

 THIS CAUSE is before the court upon the parties’ objections to the Special Master’s Reports and Recommendations Re: the Crime-Fraud Exception [D.E. 363 & 367], On April 28, 2000, the court heard oral argument upon the objections to the Special Master’s reports and recommendations regarding the crime fraud exception
 
 [1]
 
 and upon Plaintiffs motion for attor
 
 *1280
 
 ney’s fees and costs. This order disposes of the objections to the reports and recommendations. The effect of this Order is to remove the attorney-client and work product
 
 [2]
 
 privileges with respect to 280 documents listed on Defendants’ January 17, 1997 partial preliminary privilege log [D.E. # 192]. The documents identified in the Log fit into three general categories: (i) communications between DuPont and Alta relating to the testing and analysis performed in the
 
 Bush Ranch
 
 and/or
 
 Kawamata
 
 actions; (ii) subsequently prepared, internal DuPont documents which refer to prior communications between DuPont and Ala regarding the
 
 Bush Ranch
 
 and/or
 
 Kawamata
 
 soils tests, and (in) documents prepared in subsequent Benlate actions where Alta’s testing in the
 
 Bush Ranch
 
 and/or
 
 Kawamata
 
 cases was at issue. A final ruling on the issue of attorney’s fees related to the crime/fraud hearings will follow shortly.
 

 Defendants E.I. du Pont de Nemours and Company and Edgar S. Woolard, Jr. (collectively, “DuPont”) have asserted the following five objections to the Special Master’s Reports and Recommendations: (1) the Special Master applied an erroneous legal standard and burden of proof; (2) the theories suggested by the Special
 
 *1281
 
 Master are based on erroneous principles of imputed knowledge; (3) the Special Master relied on theories of possible fraud that failed to demonstrate that the client intended or even contemplated any fraud; (4) the eighteen documents at issue in this appeal were not prepared or used in furtherance of theories of fraud at issue in this case; and (5) it was error to recommend unsealing the transcript from the crime/fraud hearing. Plaintiff responded and also asserted additional errors in: (1) the Special Master’s ruling that the plaintiffs could not take discovery regarding whether Dupont was actually denied the opportunity to present evidence at the Rule 60(b) hearing in Hawaii; (2) the Special Master’s finding that plaintiff may not use evidence developed in the crime fraud hearings for the remainder of the case; and (3) the Special Master’s finding that Dupont need not produce certain documents that were listed on another Dupont privilege log that was not part of the crime-fraud motion.
 

 After careful consideration of the parties’ arguments, the relevant case law, and the record as a whole, the court concludes that the recommendation that the transcript of the crime/fraud hearing should be unsealed should be set aside, but that all of the Special Master’s other reports and recommendations should be affirmed.
 

 II. Factual and Procedural Background
 

 This case is a federal securities law class action lawsuit, filed on September 29,1995, and brought by plaintiff on behalf of himself and all other persons who purchased E.I. Dupont de Nemours common stock during the period from June 19, 1993 to January 27, 1995, inclusive (the “Class Period”).
 
 [3]
 
 Plaintiff alleges that DuPont and its former CEO, Defendant Edgar J. Woo-lard, Jr., violated §§ 10(b) and 20(a) of the Securities Exchange Act of 1934, by concealing and misrepresenting material facts regarding the likelihood and magnitude of DuPont’s potential liability in connection with thousands of product liability lawsuits regarding a DuPont agricultural product called Benlate.
 

 In order to understand the nature of the issues involved in the crime/fraud exception motion that forms the basis for this Order, it is necessary to consider the background litigation that led to the commencement of this case.
 

 In mid-1993, the United States District Court, Middle District of Georgia, Elliot, J., heard the first Benlate case to proceed to trial in the United States. That action was entitled
 
 Bush Ranch v. Du Pont.
 
 The primary issue at trial was whether Ben-late, a fungicide manufactured by DuPont and sold to the plaintiffs for use in their nurseries, was contaminated with highly toxic herbicides known as solfonylureas (“SUs”). As part of their preparation for trial, DuPont retained a sophisticated and specialized lab called Alta Analytical Labs, Inc. (“Alta”) to analyze soil samples from the
 
 Bush Ranch
 
 plaintiffs’ premises for the presence of SUs. After the case was submitted to the jury, the plaintiffs in the
 
 Bush Ranch
 
 litigation offered to settle their claims, and DuPont agreed. Accordingly, on August 16, 1993, the plaintiffs in the
 
 Bush Ranch
 
 litigation voluntarily dismissed their claims with prejudice.
 

 After the settlement, the plaintiffs in another Benlate trial against DuPont,
 
 Ka-wamata Farms v. DuPont,
 
 Civil Action No. 91-437 (Kona) and 92-247K (Kona), Circuit Court of the Third Circuit, State of Hawaii, requested documents related to the testing of Benlate from the
 
 Bush Ranch
 
 litigation. DuPont resisted, but eventually produced the documents pursu
 
 *1282
 
 ant to a court order. Among the documents produced were some of the Alta documents, which DuPont had not produced in the
 
 Bush Ranch
 
 litigation. These documents included analytical findings that some experts would construe as evidence that the soil samples taken from the
 
 Bush Ranch
 
 plaintiffs’ soil contained Benlate that was contaminated with SUs.
 

 As a result of the production of the Alta documents in Hawaii, the
 
 Bush Ranch
 
 plaintiffs returned to the federal district court in Georgia on March 22, 1995, more than a year and a half after the settlement of the
 
 Bush Ranch
 
 litigation, with a petition seeking sanctions against DuPont. The
 
 Bush Ranch
 
 plaintiffs alleged that DuPont had engaged in acts of misrepresentation and concealment as to critical evidence which constituted a fraud on the court and a contempt of the court’s orders. The alleged violations included intentionally withholding evidence of SU contamination that DuPont had in its possession and that the district court had ordered it to produce, and falsely representing to the district court and the plaintiffs that the Alta documents that were withheld contained no evidence of SU contamination. On August 21, 1995, the district court issued an ■ order agreeing with the
 
 Bush Ranch
 
 plaintiffs and sanctioning DuPont by, among other things, ordering DuPont to either pay $101 million to the court or publish a judicially approved confession of guilt in selected newspapers across the United States.
 
 See In re E.I. du Pont de Nemours and Co.,
 
 918 F.Supp. 1524 (M.D.Ga.1995). Fourteen months later, on October 17, 1996, the Eleventh Circuit reversed the Georgia court on the ground that the sanctions were punitive and that the court had not followed applicable criminal procedure.
 
 See In re E.I. DuPont De Nemours and Co.-Benlate Litigation,
 
 99 F.3d 363 (11th Cir.1996),
 
 cert. denied by E.I. du Pont de Nemours and Co. v. Bush Ranch, Inc.,
 
 522 U.S. 906, 118 S.Ct. 263, 139 L.Ed.2d 190 (1997). In ordering a remand “even though DuPont and its counsel may very well have engaged in criminal acts,” the Eleventh Circuit noted the “serious nature of the allegations” and stated that it assumed the U.S. Attorney would conduct an investigation.
 
 In re E.I. DuPont,
 
 99 F.3d at 369. On remand, the district court asked the United States Attorney to investigate and prosecute DuPont for criminal contempt, but the court ultimately approved a civil settlement resolving the matter, which required DuPont and Alston & Bird to make payments totaling $11.25 million.
 
 Matsuura v. Alston & Bird,
 
 166 F.3d 1006, 1007-08 (9th Cir. 1999)
 
 (citing In re E.I. du Pont,
 
 No. 4:95-CV-36 (HL) (M.D.Ga. Nov. 4, 1998) (order referring matter to U.S. Attorney) and (M.D.Ga. Dec. 31,1998) (consent order and final judgment)).
 

 Meanwhile, the
 
 Kawamata
 
 case in Hawaii proceeded to trial, with the jury returning verdicts in favor of the plaintiffs on all the causes of action on January 26, 1995. However, after learning about the developments in the
 
 Bush Ranch
 
 litigation, the plaintiffs and declaratory defendants in the
 
 Kawamata
 
 case returned to the circuit court and filed motions, pursuant to Rule 60(b)(3) of the Hawaii Rules of Civil, Procedure (“HRCP”), seeking to alter or amend the judgment based upon the newly discovered evidence of fraud, intentional misrepresentation, and other misconduct by DuPont, and to have sanctions imposed. The Hawaii Circuit Court, Ibar-ra, J., issued an opinion on August 19, 1996, finding that DuPont had engaged in fraud and intentional misconduct which abused the judicial process.
 
 See
 
 “Findings of Fact; Conclusions of Law; Order Re: Plaintiffs’ and Declaratory Relief Defendants’ Motions for Rule 60(b), H.R.C.P. Relief and for Sanctions Against Defendant E.I. DuPont de Nemours and Company, Inc. Filed August 31, 1995 and September 12, 1995; Exhibits A’-‘X’,” August 19, 1996, in
 
 Kawamata Farms v. DuPont,
 
 Civil Action No. 91-437 (Kona) and 92-247K (Kona), Circuit Court of the Third Circuit, State of Hawaii (hereinafter “August 19, 1996 Order”). Among the many examples
 
 *1283
 
 of fraud and misconduct found by the circuit court was the finding that DuPont had engaged in discovery misconduct by asserting the work product privilege with respect to the Alta
 
 Bush Ranch
 
 documents.
 
 See
 
 August 19, 1996 Order, Conclusions of Law, ¶¶ 23-30.
 
 [4]
 

 The Hawaii circuit court’s August 19, 1996 Order was affirmed by the Supreme Court of Hawaii on December 11, 1997.
 
 See Kawamata Farms, Inc. v. United Agri Products,
 
 86 Hawaii 214, 948 P.2d 1055 (Haw.1997). The Hawaii Supreme Court recognized that “the record shows that DuPont committed discovery fraud upon the circuit court and the other parties.”
 
 Kawamata Farms,
 
 86 Hawaii at 256, 948 P.2d at 1097. Finding that DuPont’s discovery fraud was “unusual, unique,” and “unprecedented,” the Hawaii Court concluded that it would depart from federal interpretations of Rule 60(b) and permit a prevailing party to move for additional attorneys’ fees and costs after the verdict.
 
 Id.
 

 In the case currently before this court, all discovery matters were referred to Special Master Theodore Klein, Esq., on January 8, 1997 [D.E. 119]. On October 6, 1997, Plaintiff moved to compel production of approximately 280 documents listed on Defendants’ January 17, 1997 partial preliminary privilege log [D.E. 192], arguing that any attorney-client or work product privilege applicable to the documents in question had been vitiated pursuant to the crime/fraud exception. The privileged documents referred to in the motion constituted a partial set of documents responsive to Request No. 18 of Plaintiffs first Rule 34 request, which sought documents referring or relating in any way to communications between Alta and DuPont or DuPont’s litigation counsel during the period January 1, 1992 to October 31, 1995. Between January 1998 and December 1999, Special Master Klein issued a number of Orders and Reports and Recommendations ■with respect to the crime/fraud exception, ultimately finding that DuPont failed to rebut the plaintiffs
 
 prima facie
 
 showing that the crime/fraud exception applies. Pursuant to the Stipulated Order entered on December 22, 1998 [D.E. 280], any determination on substantive objections to the Special Master’s crime/fraud findings was reserved until consideration of a plenary appeal on all the crime/fraud issues by this court.
 

 III. Standard of Review
 

 The findings of fact made by a Special Master must be accepted by the district court unless clearly erroneous.
 
 Martin v. Univ. of South Ala.,
 
 911 F.2d 604, 608 (11th Cir.1990). The party objecting to the findings of the Special Master carries the burden of proving such clear error.
 
 Id.
 
 It is also well settled that a Master’s conclusions of law are subject to
 
 de novo
 
 review by the district court.
 
 Id.; Oil, Chemical, and Atomic Workers International Union, AFL
 
 —CIO
 
 v. Nat’l Labor Relations Bd.,
 
 547 F.2d 575, 580 (D.C.Cir.1976).
 

 IV. Discussion
 

 After the Special Master issued his December 22, 1999 Clarification of his November 16, 1999 Report and Recommendation, this court accepted briefs from both sides pertaining to objections to the Special Master’s crime/fraud exception recommendations. A hearing on these objections was then held on April 28, 2000.
 
 *1284
 
 DuPont’s objections went to three Reports and Recommendations and one Clarification issued by the Special Master: (1) Report and Recommendation Re: Appropriate Evidentiary Standard Re: Crime/ Fraud Motion, Dec. 1, 1998 [DuPont’s 1/21/00 Brief, Ex. A]; (2) Report and Recommendation Re: DuPont’s Failure to Rebut Prima Facie Showing of Crime/Fraud Exception, Oct. 18, 1999 [DuPont’s 1/21/00 Brief, Ex. Bj; (3) Revised Report and Recommendation Re: Disclosure of Documents in Connection with Crime/Fraud Hearing, Nov. 16, 1999 [DuPont’s 1/21/00 Brief, Ex. C]; and (4) Special Master’s Clarification of his November 16, 1999 Report and Recommendation, Dec. 22, 1999 [DuPont’s 1/21/00 Brief, Ex. D], Plaintiffs objections went to two Clarifications and one Order issued by the Special Master: (1) Special Master’s Clarification of April 1, 1998 Report and Recommendation, Apr. 8, 1998 [Plaintiffs 1/21/00 Brief, Ex. H]; (2) Protective Order Regarding Procedures Governing the Crime/Fraud Proceedings, June 18, 1998 [Plaintiffs 1/21/00 Brief, Ex. I]; and (3) Special Master’s Clarification of his November 16, 1999 Report and Recommendation, Dec. 22, 1999 [Plaintiffs 1/21/00 Brief, Ex. K],
 

 Unappealed by the parties, and thus not subject to collateral attack, is the Special Master’s January 13, 1998 Order on Plaintiffs Motion to Compel Re: Crime/Fraud Exception, which set forth the two-prong analysis for the crime/fraud exception and applied that analysis, finding that the plaintiffs had established a
 
 prima facie
 
 case. This court has the power to adopt, modify, or reject the Special Master’s findings.
 
 See
 
 Fed.R.Civ.P. 53(e)(2). Upon independent review, this court affirms the crime/fraud analysis employed by the Special Master and the conclusion that a
 
 pri-ma facie
 
 case had been established, and reasserts those findings here.
 

 The attorney-client privilege is one of the oldest confidential communication privileges known in the common law. The privilege’s “purpose is to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice.”
 
 Upjohn Co. v. United States,
 
 449 U.S. 383, 389, 101 S.Ct. 677, 682, 66 L.Ed.2d 584 (1981). The work product privilege similarly protects activities that are valued under our legal system.
 
 Hickman v. Taylor,
 
 329 U.S. 495, 508, 67 S.Ct. 385, 392, 91 L.Ed. 451 (1947). However, it is well established that an otherwise valid assertion of privilege, either attorney-client or work product, can be overcome by the proper invocation of the crime/fraud exception.
 
 Cox v. Administrator United States Steel & Carnegie,
 
 17 F.3d 1386, 1422 (11th Cir.1994) (affirming district court denial of
 
 in camera
 
 review of documents since no showing that communications with attorney either furthered or were closely related to the attempt to conceal the illegal actions),
 
 modified,
 
 30 F.3d 1347 (11th Cir.1994),
 
 cert. denied,
 
 513 U.S. 1110, 115 S.Ct. 900, 130 L.Ed.2d 784 (1995);
 
 In re Grand Jury Proceedings,
 
 604 F.2d 798, 803 (3d Cir.1979). The crime/fraud exception requires the disclosure of otherwise privileged communications or material obtained in the course of the attorney’s duties on the client’s behalf which are made or performed in furtherance of a crime, fraud, or other misconduct fundamentally inconsistent with the basic premises of the adversary system.
 
 See, e.g., Clark v. United States,
 
 289 U.S. 1, 53 S.Ct. 465, 77 L.Ed. 993 (1933);
 
 In re Sealed Case,
 
 676 F.2d 793, 812 (D.C.Cir. 1982). “A privilege surviv[es] until the relation is abused and vanishes] when the abuse is shown to the satisfaction of the judge ...”
 
 Clark,
 
 289 U.S. at 16, 53 S.Ct. at 470. The application of this exception is primarily controlled by the client’s intent — it is unnecessary to show that the attorney had actual or constructive knowledge of the crime.
 
 United States v. Soudan,
 
 812 F.2d 920, 927 (5th Cir.1986).
 

 
 *1285
 
 Under Eleventh Circuit law, a two-part test is employed to determine whether the crime/fraud exception applies:
 

 First, there must be a prima facie showing that the client was engaged in criminal or fraudulent conduct when he sought the advice of counsel, that he was planning such conduct when he sought the advice of counsel, or that he committed a crime or fraud subsequent to receiving the benefit of counsel’s advice. Second, there must be a showing that the attorney’s assistance was obtained in furtherance of the criminal or fraudulent activity or was closely related to it.
 

 In re Grand Jury Investigation (Schroeder),
 
 842 F.2d 1223, 1226 (11th Cir.1987);
 
 see also Cox,
 
 17 F.3d at 1416. “The first prong is satisfied by a showing of evidence that, if believed by a trier of fact, would establish the elements of some violation that was ongoing or about to be committed.”
 
 Schroeder,
 
 842 F.2d at 1226. Such a showing must have a foundation in fact, and cannot rest upon mere allegation.
 
 Id.
 
 When determining the second prong, the requirement that the legal advice be in furtherance or related to fraudulent conduct “should not be interpreted restrictively.”
 
 Id.
 
 at 1227.
 

 The Special Master then analyzed the evidence presented by the Plaintiff and found that the facts were sufficient to establish a
 
 prima facie
 
 showing that DuPont was engaged in fraudulent conduct when it sought the advice of counsel.
 
 See
 
 Special Master’s 1/13/98 Order, p. 5. The Special Master relied primarily upon the findings of fact and conclusions of law of the Hawaii Supreme Court in
 
 Kawamata Farms, Inc. v. United Agri Products,
 
 86 Hawaii 214, 948 P.2d 1066 (Haw.1997) and the Circuit Court of the Third Circuit of Hawaii’s August 22, 1996 Order in the underlying
 
 Kawamata
 
 case.
 
 [5]
 
 The court concurs with
 
 *1286
 
 the conclusion that a
 
 prima facie
 
 case of fraud was shown by the plaintiffs.
 

 Furthermore, this court finds that the
 
 prima facie
 
 case of fraud is not limited to the thirteen bullet points listed on page 3-5 of the Special Master’s January 13, 2000 opinion. The fraud found by the Hawaiian courts was extensive and involved, and covered numerous levels of discovery and acts by DuPont. As the Special Master noted in his October 13, 1999 Report and Recommendation, the listing of the 13 specific findings of fact by the Special Master was preceded by the statement, “The [Hawaii Supreme] Court implicitly adopted the Hawaii Circuit Court’s findings of fact and conclusions of law,
 
 among which were the following:
 
 ” The Special Master intended this statement to reflect that “[t]he full panoply of the findings of the Hawaii Supreme Court [and Hawaii Circuit Court] formed the basis for the
 
 prima facie
 
 determination, not just the 13 enumerated items.” Oct. 13, 1999 Report and Recommendation, p. 12 n. 6. This court concurs with that interpretation of the Special Master’s report, and finds that it constitutes a correct analysis of the
 
 prima facie
 
 analysis. Holding that the Special Master’s finding of fraud was limited to the thirteen bullet points listed in the January 13, 2000 opinion would misinterpret the findings of the Hawaiian courts and improperly constrain the crime/fraud analysis in this case.
 

 As the Hawaii Supreme Court noted, DuPont’s representation to the circuit court that it had previously asserted the work product privilege with respect to the Alta
 
 Bush Ranch
 
 documents in other Ben-late-related cases was just one “[a]mong the many examples of misconduct” evidenced by DuPont’s actions.
 
 Kawamata Farms,
 
 86 Hawai'i at 258, 948 P.2d at 1098. Amongst the other relevant fraudulent acts that the Hawaii Circuit Court found DuPont had perpetrated upon the court and the parties, which the Special Master did not explicitly list in the January 13, 1998 Order, were the following:
 

 • DuPont intentionally violated three Orders to compel issued by Judge Ibarra between May and July 1993 regarding ongoing and completed 1993 Benlate testing.
 
 See
 
 August 22, 1996 Rule 60(b) Opinion in
 
 Kawamata Farms, Inc. v. United Agri Products,
 
 Civ. No. 91-437 and 92-247K, Haw. 3rd Cir.Ct., F/F at ¶¶ 40-47, C/L at ¶¶ 18-19.
 
 [6]
 
 The Circuit Court found
 
 *1287
 
 that the Alta
 
 Bush Ranch
 
 documents were responsive to the interrogatories and Orders that DuPont violated.
 
 Id.,
 
 F/F at ¶ 44.
 

 • In addition to testifying falsely on July 7, 1993 that there was no ongoing 1993 testing, Dr. George Frank also falsely testified that the
 
 Kawamata
 
 plaintiffs had received all 1993 testing data. August 22, 1996 Rule 60(b) Opinion, F/F at ¶¶ 36-39. Dr. Frank was Corporate Counsel with DuPont and was designated by DuPont as “the person in charge of coordinating the Benlate litigation in all cases.”
 
 Id.
 
 at F/F at ¶¶ 32-33.
 

 • DuPont’s Chief Executive Officer Edgar S. Woolard testified at the May, 1995 fraud hearing that he approved and ratified the conduct of DuPont and it’s attorneys in the
 
 Bush Ranch
 
 litigation with respect to the Alta
 
 Bush Ranch
 
 documents. August 22, 1996 Rule 60(b) Opinion at F/F ¶ 53.
 

 • In addition to DuPont’s false and misleading statements to the Court on November 19, 1993 and in January 1994 regarding waiver of the work product privilege and production of documents, DuPont also made false and misleading representations to the Court on February 16, 1994 in a memorandum opposing Master Takao’s recommendation that the
 
 Bush Ranch
 
 Alta documents be produced to Plaintiffs. August 22, 1996 Rule 60(b) Opinion at F/F ¶¶ 76-81.
 

 These findings, combined with the findings of the Hawaiian Circuit Court specifically listed in the Special Master’s January 13, 1998 Order, constitute evidence of an ongoing fraudulent scheme by DuPont to thwart discovery of the Alta
 
 Bush Ranch
 
 documents, and are sufficient to show a
 
 prima facie
 
 case. It is particularly appropriate to consider the full panoply of findings in the August 22, 1996 Rule 60(b) Opinion, the Hawaii Supreme Court’s Dec. 11, 1997
 
 Kawamata
 
 Opinion, and the evidence adduced at the Georgia
 
 Bush Ranch
 
 sanction hearings because the Special Master, in his Jan. 13, 1998 Order, alluded to the fact that the specific facts listed were not exhaustive of DuPont’s fraud and Plaintiffs October 6, 1997 memorandum in support of its motion .to compel [D.E. 192] described DuPont’s entire fraud on the
 
 Kawamata
 
 court to support the crime/ fraud exception.
 

 The Special Master proceeded to find that although the facts are sufficient to show that the attorney-client relationship was used to further the ostensible fraud, and thus meet the second prong of the crime/fraud exception, the only logical way to identify the individual documents that should not be privileged was to examine them
 
 in camera.
 
 The Special Master reserved on whether DuPont was entitled to present additional evidence and testimony to show that the exception does not apply.
 

 In a subsequent Report and Recommendation that has also not been objected to by the parties, the Special Master concluded that DuPont should be “given the limited opportunity to supplement the record with live testimony which it maintains it was deprived of presenting in Hawaii” before the attorney-client privilege is irreversibly abrogated. Report and Recommendation Re: Application of Collateral Estoppel, Apr. 1, 1998, p. 1, 8. The procedures for this hearing were set forth by the Special Master, and confirmed and supplemented by this court.
 
 See
 
 Order on Objections to Special Master Recommendations, Oct. 26,1998, D.E. 270.
 

 The crime/fraud hearing conducted by the Special Master took place on June 28, 29, 30, and July 1, 1999. DuPont presented the testimony of five attorneys and a number of exhibits to support its contention that the crime/fraud exception should not be applied, and plaintiffs also introduced exhibits. The five attorneys presented were: Jonathan Pittman, a lawyer at Crowell & Moring in D.C. who served as national coordinating counsel for DuPont for all Benlate litigation; John Lacey of the Hawaii firm of Goodsill Anderson,
 
 *1288
 
 who served as lead counsel for DuPont in the Hawaii litigation; Lisa Bail, a Goodsill Anderson associate; Lisa Passante, in-house counsel for DuPont who oversaw the Hawaii litigation; and James Shomper, in-house counsel for DuPont who oversaw the
 
 Bush Ranch
 
 litigation and who acted as the center of the coordination effort on the question of whether SU testing documents involved in one Benlate case would be the subject of work product protection claims in another Benlate case. Neither party objected to the factual findings of the Special Master in his October 13, 1999 Report and Recommendation. Upon review, the court finds that the factual findings are not clearly erroneous, and are thus set forth as follows.
 

 The
 
 Bush Ranch
 
 litigation actions that were central to the crime/fraud inquiry took place between June 1 and August 15, 1993. DuPont was represented in the
 
 Bush Ranch
 
 litigation by Alston and Bird. The pertinent categories of actions consisted of: (1) Disclosure of some Alta test results in the
 
 Bush Ranch
 
 case through their use at a deposition of Nicholas Alber-go, an in-house DuPont expert, and their offer into evidence; (2) The offer by Alston and Bird attorney Elizabeth Gilley during the
 
 Bush Ranch
 
 trial of a box of Alta testing raw data to plaintiffs counsel to forestall a Rule 1006 objection; and (3) Dupont’s listing of Alta as a fact witness in the
 
 Bush Ra/nch
 
 case.
 

 Meanwhile, the
 
 Kawamata
 
 litigation was proceeding in Hawaii, where DuPont was sanctioned on numerous occasions for discovery violations. In the fall of 1993, after the
 
 Bush Ranch
 
 trial took place in Georgia, the Hawaii plaintiffs moved to require DuPont to produce results of SU testing from all other cases. The Washington, D.C. law firm of Crowell & Moring was acting as national coordinating counsel for DuPont for all Benlate related litigation. Jonathan Pittman, a lawyer at Crowell & Moring, was charged with the responsibility of gathering information from all counsel handling Benlate cases to determine whether they had ordered SU testing, and if so, whether they had waived the work product privilege with reference to such testing. Pittman helped draft a pleading in the
 
 Kawamata
 
 case dated November 19, 1993 in which DuPont opposed any disclosure of SU testing. Based on representations made to him that he believed to be true, Pittman represented that DuPont had “never waived the work product privilege” with regard to any SU testing in other jurisdictions. At that point, the only effort Pittman made to verify this conclusion was to confer with the attorneys at his own law firm.
 

 Thereafter, Hawaii Circuit Judge Ibarra ordered production of SU test results in other cases and required creation of a privilege log. In response, Pittman conducted a more detailed inquiry from counsel representing DuPont in Benlate cases throughout the country. As part of this inquiry, Pittman contacted Gilley and learned from her that she had used some of the Alta test results during the Albergo deposition in the
 
 Bush Ranch
 
 case and had offered others at the
 
 Bush Ranch
 
 trial. She also told Pittman there was a box of Alta raw data, and that the
 
 Bush Ranch
 
 plaintiffs attorney knew about them, but did not want them. According to Pittman, Gilley told him that she still considered the Alta data work product. Gilley never told Pittman that she had actually offered the box to the plaintiff during the trial, nor did she tell Pittman that Alta had been listed as a fact witness for the
 
 Bush Ranch
 
 trial.
 

 Based upon his contact with Gilley and other DuPont counsel nationwide, Pittman helped prepare a Memorandum of Law, filed in the Hawaii Circuit Court on January 14, 1994, in response to the court’s Order requiring production of SU testing. He also participated in the preparation of a privilege log. He listed the box of documents that Gilley stated were work product on the privilege log. In the January 14th memorandum, Pittman listed the documents that had been produced in
 
 Bush Ranch
 
 and several other cases, and then
 
 *1289
 
 stated, “No documents other than the above were produced, proffered, or in any way used in connection with any other Benlate trial.” In the hearings before the Special Master in this case, Pittman admitted that his statement in the November 19, 1993 memorandum that DuPont “has never waived the work product privilege” was “incorrect,” but maintained that his January 14, 1994 memorandum corrected the November 19, 1993 error. Pittman testified that had he known Alta had been listed as a fact witness in
 
 Bush Ranch,
 
 he might have advised the Special Master in Hawaii of that fact. He also testified that he did not know of Gilley’s offer of the box of raw data to plaintiffs counsel, but had he known, he would have disclosed that to the Hawaii court as well.
 

 John Lacey, lead counsel for DuPont in the Hawaii litigation, received his information from others and was mainly responsible for leading the lawyers into battle. Lisa Bail simply transmitted information from Pittman to Lacey. Neither Hawaii lawyer spoke to the
 
 Bush Ranch
 
 lawyers.
 

 Lisa Passante, in-house counsel who oversaw the Hawaii litigation, also had no contact with the
 
 Bush Ranch
 
 lawyers.
 

 James Shomper, in-house counsel for DuPont, oversaw the
 
 Bush Ranch
 
 litigation, and also conferred with Pittman, the national coordinating counsel from Crowell
 
 &
 
 Moring, and Kirkpatrick and David,
 
 Bush Ranch
 
 lawyers from Alston
 
 &
 
 Bird, on the Alta testing work product issues. Shomper told Passante that DuPont’s position was that Alta testing was work product unless it had been disclosed by trial counsel in the underlying case. Shomper kept close watch on the
 
 Bush Ranch
 
 case. He was in Columbus, Georgia for the
 
 Bush Ranch
 
 case almost daily while trial was in progress, but attended the trial itself only occasionally. He would generally attend for several hours a day. He spoke with the trial lawyers pretty much on a daily basis about strategy and what was going on in the trial. He could not recall if he was present when Gilley offered the box of Alta raw data to plaintiffs counsel in open court. If he was, the statement didn’t dawn on him as anything significant at the time.
 

 Following the Special Master’s final rulings on the crime/fraud exception, the parties’ submitted memoranda to the court detailing their particularized objections. Those objections are set forth and discussed below.
 

 A. DuPont’s Objections:
 

 DuPont has argued that the Special Master committed four errors of law in the crime/fraud rulings. Specifically, these errors are alleged to be: (1) applying an erroneous legal standard and burden of proof in evaluating the crime/fraud evidence adduced at the hearing before the Special Master; (2) relying on erroneous principles of imputed knowledge; (3) stripping the privilege where the evidence fails to show the client intended to commit fraud; and (4) failing to properly apply the second, ‘in furtherance of,’ prong of the crime/fraud exception. Because these objections are based on the Special Master’s conclusions of law, the court will review the matters
 
 de novo.
 

 1. Legal Standard and Burden of Proof
 

 DuPont argues that the Special Master applied an erroneous legal standard and burden of proof to the evidence that was presented at the crime/fraud hearing. It is DuPont’s contention that rather than evaluating the evidence on the merits to determine whether any fraud had actually occurred, the Special Master adopted the lower
 
 prima facie
 
 standard, thereby placing the burden of proof on DuPont to rebut all possible theories of potential fraud. In response, Plaintiff argues that DuPont’s suggested more stringent standard would be contrary to the law of this circuit and is not supported by the case law.
 

 
 *1290
 
 In his October 13, 1999 Report and Recommendation re: DuPont’s Failure to Rebut
 
 Prima Facie
 
 Showing of Crime-Fraud Exception, the Special Master made a number of pertinent findings in his conclusions of fact and law. These included the conclusion that Mr. Shomper should have been aware of Ms. Gilley’s actions and should have realized their importance; that DuPont could have employed methods to obtain the testimony of Gilley, David, and Kirkpatrick for use at the hearing, but did not, thus leaving the Hawaii findings regarding their statements and actions essentially unrebutted; that Gilley knew she had represented to the Georgia court that Alta was a fact witness and that no privilege applied when she made contrary representations to Pittman; that David knew of Gilley’s representations regarding Alta and the offer of the documents to plaintiffs attorney when he was admitted
 
 pro hac vice
 
 but did not advise the Hawaii court; that David had a duty to advise the Hawaii court of these facts and correct the record, and that David’s knowledge was imputed to the other Hawaii attorneys; that DuPont had in-house counsel charged with monitoring the cases, and in-house counsel’s knowledge is imputed to DuPont; and that to pierce the privilege, the plaintiffs do not have to prove that the acts in question were in fact intentional. In contesting the legal standard, DuPont has seized upon the language used by the Special Master in his final conclusion re: proof that the acts were intentional. The Special Master stated:
 

 Finally, Defendants contend that to invoke the crime-fraud exception, the proponent must prove that the acts in question were intentional. Defendants maintain that their actions were proper, but at worst, were occasioned in large part by failures to communicate in a massive legal undertaking. As such, they should not be penalized for unintentional conduct.
 

 The foregoing may be true for the ultimate determination of that issue, since that question will be one of the linchpins for the trier of fact in this case. But that is not the test for piercing the privilege at this juncture. As the Special Master has noted in earlier Reports, all that is required now is the much lower threshold of establishing a
 
 prima facie
 
 case. That has already been established, as noted above. The law only demands a showing of evidence that if believed by the trier of fact would establish the elements of an ongoing crime or fraud.
 
 In re Sealed Case,
 
 107 F.3d 46 (D.C.Cir.1997);
 
 In re Grand Jury Investigation (Schroeder),
 
 842 F.2d 1223 (11th Cir.1987). There are numerous theories which fall within that rubric which are capable of belief. For example, a jury could believe that David, being aware of a waiver, nevertheless perpetuated a misstatement to the Hawaii court. Or, a jury could believe that Shomper also was aware of a waiver and failed to communicate that fact to Pas-sante. Armed with such knowledge, Passante’s duty would be clear. Either of those themes, among others, are plausible, supported by the evidence, capable of belief, and were never adequately rebutted. The inevitable result of such conduct, if believed by a trier of fact, would be a series of misstatements made to the Hawaii court which would have never taken place but for the conduct of DuPont and its attorneys.
 

 As the Special Master stated in an earlier report, DuPont may very well have explanations for all of the foregoing; but thus far it has failed to carry its burden with the explanations provided. It will have other opportunities to present its evidence where the standard is different.
 

 In this instance, the
 
 prima facie
 
 showing having already been made, the Plaintiff has satisfied his burden. The evidence thus presented, not sufficiently rebutted, and if believed by the trier of fact, would establish the elements of fraud.
 

 
 *1291
 
 10/13/99 R
 
 &
 
 R, pp. 15-16. DuPont argues that this passage demonstrates that the Special Master applied an erroneous legal standard and burden of proof that is contrary to the analysis employed by the majority of courts that have considered the crime/fraud exception. This court disagrees and finds that the Special Master’s conclusion is in accord with the law of this Circuit.
 

 One of DuPont’s arguments is that the
 
 'prima facie
 
 standard used by the Special Master was erroneously taken from the grand jury context. However, the Eleventh Circuit has consistently applied the two-prong,
 
 prima facie
 
 test initially set out in
 
 In re Grand Jury Investigation (Schroeder),
 
 842 F.2d 1223 (11th Cir.1987) to determine whether the crime-fraud exception applies, regardless of whether the question is presented in the grand jury context or a complex civil case. For example, in
 
 Cox v. Administrator United States Steel & Carnegie,
 
 17 F.3d 1386 (11th Cir. 1994), a complex civil case in which the plaintiffs argued that the crime/fraud exception applied because the defendant made false statements through its counsel as part of an effort to conceal illegal actions, the Eleventh Circuit stated the test to determine whether the crime-fraud exception applies as follows:
 

 To determine whether the crime-fraud exception applies, we employ a twopart test laid out in
 
 In re Grand Jury Investigation (Schroeder),
 
 842 F.2d 1223, 1226 (11th Cir.1987):
 

 First, there must be a
 
 prima facie
 
 showing that the client was engaged in criminal or fraudulent conduct when he sought the advice of counsel, that he was planning such conduct when he sought the advice of counsel, or that he committed a crime or fraud subsequent to receiving the benefit of counsel’s advice. Second, there must be a showing that the attorney’s assistance was obtained in furtherance of the criminal or fraudulent activity or was closely related to it.
 

 Cox,
 
 17 F.3d at 1416.
 

 Applying the standard set forth above is often easier said than done. Many courts have struggled with questions such as what constitutes a
 
 prima facie
 
 showing, whether the
 
 prima facie
 
 showing changes in different contexts, the ultimate burden of proof needed to sustain the crime/fraud exception, and who carries the burden of proof.
 
 See, e.g., Laser Indus., Ltd. v. Reliant Tech., Inc.,
 
 167 F.R.D. 417 (N.D.Ca. 1996);
 
 American Tobacco Co. v. State of Fla.,
 
 697 So.2d 1249 (Fla. 4th DCA 1997).
 

 The Special Master’s crime/fraud hearing fell under the aegis of Federal Rule of Evidence 104(a), which states that, “Preliminary questions concerning ... the existence of a privilege, or the admissibility of evidence shall be determined by the court.” Fed.R.Evid. 104(a);
 
 see also
 
 Special Master’s Additional Clarification of June 18, 1998 Report and Recommendation, D.E. 260. Although Rule 104(a) does not specify the burden of proof that should be applied to such determinations, the Supreme Court has had occasion to analyze the Rule and has stated the following:
 

 We are therefore guided by our prior decisions regarding admissibility determinations that hinge on preliminary factual questions. We have traditionally required that these matters be established by a preponderance of proof. Evidence is placed before the jury when it satisfies the technical requirements of the evidentiary Rules, which embody certain legal and policy determinations. The inquiry made by a court concerned with these matters is not whether the proponent of the evidence wins or loses his case on the merits, but whether the evidentiary Rules have been satisfied. Thus, the evidentiary standard is unrelated to the burden of proof on the substantive issues, be it a criminal case, or a civil case. The preponderance standard ensures that before admitting evidence, the court will have found it more
 
 *1292
 
 likely than not that the technical issues and policy concerns addressed by the Federal Rules of Evidence have been afforded due consideration.
 

 Bourjaily v. United States,
 
 483 U.S. 171, 175, 107 S.Ct. 2775, 2778-79, 97 L.Ed.2d 144 (1987) (citations omitted). Despite this pronouncement, two years later, in
 
 United States v. Zolin,
 
 491 U.S. 554, 109 S.Ct. 2619, 105 L.Ed.2d 469 (1989), the Supreme Court found that the quantum of proof necessary ultimately to establish the applicability of the crime/fraud exception remains “subject to question,” but was not properly before the court in that case.
 
 Zolin,
 
 491 U.S. at 565 n. 7, 109 S.Ct. at 2627 n. 7. Since that time, the federal courts have not come to a definitive statement as to the amount of proof needed to establish the crime/fraud exception.
 

 The procedures employed by the Special Master in this case were somewhat similar to those described by the Third Circuit in
 
 Haines v. Liggett Group Inc.,
 
 975 F.2d 81 (3d Cir.1992). In
 
 Haines,
 
 the Third Circuit Court of Appeals reviewed the district court’s order that the crime/fraud exception applied to certain documents in the defendants’ possession. The defendants claimed that the district court had determined the applicability of the exception using a
 
 prima facie
 
 case standard, rather than a stricter preponderance of the evidence standard. Although the Circuit Court reversed the district court’s decision for improperly considering matters not before the magistrate judge, the Court found that the district court did not err in allocating the appropriate burdens and in defining the quantum of proof necessary to assert the privilege or an exception thereto.
 
 See Haines,
 
 975 F.2d at 93-94.
 

 The Third Circuit referred to the Supreme Court’s opinion in
 
 Clark v. United States,
 
 289 U.S. 1, 14-15, 53 S.Ct. 465, 469, 77 L.Ed. 993 (1933), as originally setting forth the evidentiary standard for application of the crime/fraud exception to the attorney-client privilege as follows:
 

 There must be a showing of a prima facie case sufficient to satisfy the judge that the light should be let in.... To drive the privilege away, there must be “something to give colour to the charge;” there must be “prima facie evidence that it has some foundation in fact.” When the evidence is supplied, the seal of secrecy is broken.
 

 Haines,
 
 975 F.2d at 95 (quoting
 
 Clark,
 
 289 U.S. at 14-15, 53 S.Ct. at 469 (citations omitted)). After reviewing the definitions developed by other federal courts, the
 
 Haines
 
 court concluded the
 
 prima facie
 
 showing means that “the party seeking discovery must present evidence which, if believed by the fact-finder, would be sufficient to support a finding that the elements of the crime-fraud exception were met.”
 
 Haines,
 
 975 F.2d at 95-96. This statement is essentially the same as the Eleventh Circuit’s statement in
 
 Schroeder
 
 that the
 
 prima facie
 
 prong is satisfied “by a showing of evidence that, if believed by a trier of fact, would establish the elements of some violation that was ongoing or about to be committed.”
 
 Schroeder,
 
 842 F.2d at 1226.
 

 The
 
 Haines
 
 court then determined that, consistent with
 
 Zolin,
 
 the decision to engage in
 
 in camera
 
 review involves a more lenient standard of proof than the determination to apply the crime/fraud exception. Indeed,
 
 Zolin
 
 never reached the question of how much proof was necessary to decide the ultimate issue of whether the crime/ fraud exception applies, finding only that “[bjefore engaging in
 
 in camera
 
 review to determine the applicability of the crime-fraud exception, ‘the judge should require a showing of a factual basis adequate to support a good faith belief by a reasonable person,’ that
 
 in camera
 
 review of the materials may reveal evidence to establish the claim that the crime-fraud exception applies.”
 
 Zolin,
 
 491 U.S. at 572, 109 S.Ct. at 2631 (citations omitted). For this purpose, the court may consider only the presentation made by the party challenging the privilege.
 
 Haines,
 
 975 F.2d at 96.
 

 
 *1293
 
 The
 
 Haines
 
 court distinguished the showing for
 
 in camera
 
 inspection from the decision whether the crime/fraud exception applies, finding that more formal procedures are required in which “the party-defending the privilege [should] be given the opportunity to be heard, by evidence and argument, at the hearing seeking an exception to the privilege.”
 
 Haines,
 
 975 F.2d at 97.
 

 Thus, the
 
 Haines
 
 court never departed from the
 
 prima facie
 
 standard that has also been adopted by the Eleventh Circuit.
 
 Haines
 
 simply contemplates a hearing in which both parties are given the opportunity to present evidence and argument on whether the evidence, if believed by trier of fact, would be sufficient to support a finding that the elements of the crime/fraud exception were met.
 
 See American Tobacco Co. v. State of Fla.,
 
 697 So.2d 1249, 1255 (Fla. 4th DCA 1997). In practice, this means that the party opposing the privilege on the crime/fraud exception has the initial burden of producing evidence which, if unexplained, would be
 
 prima facie
 
 proof of the existence of the exception. The burden of persuasion then shifts to the party asserting the privilege to give a reasonable explanation of its conduct.
 
 [7]
 
 If the court accepts the explanation as sufficient to rebut the evidence presented by the party opposing the privilege, then the privilege remains. If the court does not find the evidence is sufficient to rebut the
 
 prima facie
 
 case, then the
 
 prima facie
 
 case still exists and the privilege is lost.
 
 See Matter of Feldberg,
 
 862 F.2d 622, 626 (7th Cir.1988) (finding that after
 
 prima facie
 
 showing that exception applies, party asserting privilege should have opportunity to rebut; “[i]f the court finds the explanation satisfactory, the privilege remains.”). In order to carry its burden of persuasion, the party seeking to invoke the privilege has to show by a preponderance of the evidence that the
 
 pnma facie
 
 showing that the crime/fraud exception applies should not be accepted.
 

 The Special Master in this case essentially followed the procedures outlined in
 
 Haines.
 
 The plaintiffs initially made a showing of a
 
 prima facie
 
 case sufficient to require an
 
 in camera
 
 inspection of documents. Furthermore, the
 
 prima facie
 
 case presented by plaintiffs, if believed by a trier of fact, would establish the elements necessary to invoke the crime/fraud exception to the attorney-client and work product privileges. DuPont was given the opportunity to rebut the
 
 prima facie
 
 case through argument and evidence at a hearing before the Special Master. Then, upon careful consideration of the evidence, the Special Master found that DuPont had not adequately rebutted the
 
 prima facie
 
 case of fraud, and that the crime/fraud exception should be applied.
 

 DuPont argues that the Special Master’s approach w^as inconsistent with the Third Circuit’s decision in
 
 Haines
 
 because the Special Master did not provide DuPont with adequate notice of the theories of fraud that required rebuttal at the crime/ fraud hearing and because the Special Master did not specifically resolve whether there was intent to defraud. The court finds these objections to be without merit.
 

 As noted earlier in this opinion, DuPont was adequately put on notice that the
 
 pri-ma facie
 
 case of fraud included the full range of findings by the Hawaii Circuit Court and Supreme Court, as well as their incorporation of evidence from the
 
 Bush Ranch
 
 case. In his January 13, 1998 Order, the Special Master referred to the Hawaii Supreme Court’s findings that DuPont made fraudulent representations to the Circuit Court regarding production of the Alta
 
 Bush Ranch
 
 documents and falsely represented that it had previously asserted the work product privilege with respect to the Alta
 
 Bush Ranch
 
 documents
 
 *1294
 
 in other Benlate cases, and then listed thirteen specific findings of the Hawaii Circuit Court, couched by the predicate that these findings were only some of the findings implicitly adopted by the Hawaii Supreme Court. Moreover, the plaintiffs initial motion for application of the crime/ fraud exception moved pursuant to the full range of findings of the Hawaii courts. DuPont was not charged with rebutting every conceivable fraud scenario that could be conceived by anyone; but it was charged with rebutting the
 
 prima facie
 
 case of fraud that the Hawaii and
 
 Bush Ranch
 
 opinions created. Under a plain reading of the Hawaii Circuit Court’s Rule 60(b) Order, it is clear that Judge Ibarra found DuPont had perpetrated a systematic fraud that: (a) began in June 1993 with the intentional violation of three discovery orders; (b) continued with George Frank’s false testimony in July 1993; (c) was furthered by DuPont’s concealment of Alta tests which were intentionally omitted from the December 1993 and January 1994 logs and through false and misleading statements to the court in November 1993, January 1994 and February 1994; and (d) continued through and after the
 
 Kawama-ta
 
 trial with the concealment of various BAM documents. DuPont made a strategic choice to focus on rebutting the Hawaii Circuit Court’s findings in (c) that it intentionally omitted Alta test results from the December 1993 and January logs and intentionally made false and misleading statements to the Hawaii court in November 1993 and January 1994. The Special Master correctly found such evidence unable to rebut the entirety of the
 
 prima facie
 
 case, even if the court accepted DuPont’s arguments.
 

 Moreover, one of the specific items enumerated in the Special Master’s January 13, 1998 Order on Plaintiffs Motion to Compel re: Crime/Fraud Exception was the July 1993 testimony of Dr. Frank. The Hawaii Circuit Court had found the false testimony of Dr. Frank to constitute intentional conduct by DuPont to fraudulently deceive the court. However, DuPont did not provide any live testimony or new evidence regarding Dr. Frank’s July 1993 testimony, preferring to leave the findings of Hawaii court unrebutted on that point.
 

 As for the argument that the Special Master should have definitively resolved whether DuPont had specific intent to defraud, that is clearly not the purpose of the crime/fraud hearing. Once the
 
 prima fa-cie
 
 case is adequately presented, which the plaintiff managed to do in this case, the burden shifts to the defendant to rebut the
 
 prima facie
 
 showing by a preponderance of the evidence. DuPont has presented three cases for the proposition that the Special Master should have resolved the scienter defense on the merits in order to uphold the
 
 prima facie
 
 case:
 
 Sigmar-Tau Industrie Farmaceutiche Riunite v. Lon-za, Ltd.,
 
 48 F.Supp.2d 16 (D.D.C.1999);
 
 Glaxo, Inc. v. Novopharm Ltd.,
 
 148 F.R.D. 535 (E.D.N.C.1993); and
 
 Medical Lab. Management Consultants v. Am. Broad. Co., Inc.,
 
 30 F.Supp.2d 1182 (D.Ariz.1998). These cases are all distinguishable on two grounds. First, none of the cases involved a
 
 prima facie
 
 case of fraud based on a prior court’s finding of fraud for the identical conduct. Second, none of the cases addressed the quantum of proof needed to abrogate the privilege because in each case the court found that the party seeking abrogation had not presented any evidence in support of its argument. Moreover, none of these cases are binding precedent on this court, and the court finds their arguments and analysis unpersuasive. In this case, there was unrebutted evidence showing that DuPont intentionally and fraudulently violated the Hawaii circuit court’s discovery orders in June 1993, presented Dr. Frank to testify falsely in July 1993, misrepresented through Gilley the status of the Alta documents and continued to conceal documents through and after the
 
 Kawamata
 
 trial. Thus, the Special Master was not in error in finding that the
 
 prima facie
 
 ease, had not been rebutted and that the crime/fraud exception should
 
 *1295
 
 be applied, and there was no need to conclusively decide the scienter issue.
 

 2. Imputed Knowledge
 

 DuPont argues that the Special Master erred by setting forth ‘theories’ of potential fraud based on erroneous legal principles of imputed knowledge. Specifically, DuPont contends that the Special Master’s discussion of the imputation of Mr. David’s knowledge and of in-house counsels’ knowledge to other attorneys and to DuPont, as discussed on pages 13 - 15 of the October 13, 1998 Report and Recommendation, is legally flawed.
 

 Under basic agency principles, the acts of a corporation’s agents are considered to be those of a single legal actor.
 
 McAndrew v. Lockheed Martin Corp.,
 
 206 F.3d 1031, 1036 (11th Cir.2000)
 
 (citing Dussouy v. Gulf Coast Inv. Corp.,
 
 660 F.2d 594, 603 (5th Cir.1981)). Generally, “a corporation (principal) will be vicariously responsible for the wrongful acts of its employees (agents) when the acts are: (1) related to and committed within the course of employment; (2) committed in furtherance [of the business] of the corporation; and (3) authorized or subsequently acquiesced in by the corporation.”
 
 Cox v. Administrator United States Steel & Carnegie,
 
 17 F.3d 1386, 1406-07 (11th Cir. 1994) (discussing respondeat superior liability under RICO). Thus, a corporation is charged with constructive knowledge, regardless of its actual knowledge, of all material facts of which its officer or agent receives notice or acquires knowledge while acting within the course of employment and within the scope of his or her authority, even though the officer or agent does not in fact communicate the knowledge to the corporation.
 
 See
 
 3 William Meade Fletcher,
 
 Fletcher Cyclopedia of the Law of Private Corporations
 
 § 790 (1994). The law conclusively presumes that the agent has disclosed the knowledge or information to his or her principal, and charges the principal accordingly.
 
 Id.
 
 One of the justifications advanced for this rule is -that “the agent, while acting within the scope of his agency is, as to matter embraced within the agency, the principle himself or the alter ego of the principal.
 
 See
 
 Holmes, The Common Law, 232 (1890).”
 
 First Ala. Bank v. First State Ins. Co., Inc.,
 
 899 F.2d 1045, 1061 n. 8 (11th Cir.1990). Courts impose constructive knowledge upon a principal to avoid the injustice which would result if the principal could have an agent conduct business for him and at the same time shield himself from the consequences that would ensue from knowledge of conditions or notice of the rights and interests of others had the principal transacted his own business in person.
 
 See id. (citing
 
 Mechem,
 
 A Treatise on the Law of Agency,
 
 2d ed. vol. 2, § 1802 (1982)). The knowledge necessary to adversely affect the corporation need not be possessed by a single corporate agent; the cumulative knowledge of several agents can be imputed to the corporation. 3 Fletcher,
 
 Fletcher Cyclopedia
 
 at § 790. Without such an interpretation, “corporations could avoid the adverse implications of the rule by restricting the intracorporate flow of information.”
 
 Id.
 

 Knowledge and notice to an attorney may be imputed to a corporation, depending on the relationship between the parties, and the ultimate determination of whether it will be imputed depends on a factual determination.
 
 See
 
 3 Fletcher,
 
 Fletcher Cylopedia
 
 at § 807. As the Supreme Court noted in
 
 Link v. Wabash Railroad Co.,
 
 370 U.S. 626, 633-34, 82 S.Ct. 1386, 1390, 8 L.Ed.2d 734 (1962),
 

 There is certainly no merit to the contention that dismissal of petitioner’s claim because of his counsel’s unexcused conduct imposes an unjust penalty on the client. Petitioner voluntarily chose this attorney as his representative in the action, and he cannot now avoid the consequences of the acts or omissions of this freely selected agent. Any other notion would be wholly inconsistent with our system of representative litigation, in which each party is deemed bound by
 
 *1296
 
 the acts of his lawyer-agent and is considered to have ‘notice of all facts, notice of which can be charged upon the attorney.’
 

 Link,
 
 370 U.S. at 634, 82 S.Ct. at 1390 (citation and footnote omitted). The best test for determining whether notice to or knowledge of an agent, such as an attorney, is imputed to his or her principal or client is whether the condition and facts known by the agent were within the sphere of authority of that particular agent.
 
 See
 
 3 Fletcher,
 
 Fletcher Cylopedia
 
 at § 807 and 807.10.
 

 The Hawaii Circuit Court applied these agency law principles to find that: (a) the attorneys at Alston
 
 &
 
 Bird were hired by and were the agents of DuPont; (b) the attorneys at Crowell & Moring, DuPont’s National Coordinating Counsel, were hired by and were the agents of DuPont; and (c) Alta Lab was an agent of DuPont and its attorneys and was hired by DuPont itself. August 19, 1996 Order, Conclusions
 
 of Law,
 
 ¶ 42. Thus, the Hawaii Court concluded that the acts and statements of Alta Labs, Alston & Bird, and Crowell & Moring, all of which contributed to the fraud upon the Hawaii circuit court, were the acts and statements of DuPont when made within the scope of their agency.
 
 Id.
 
 at ¶ 43.
 

 At the crime/fraud hearing before the Special Master, DuPont chose to present evidence and testimony that related only to the knowledge of the attorneys in Hawaii and at Crowell
 
 &
 
 Moring. Nothing was presented to challenge the Hawaii court’s findings with respect to Alta Labs and Aston
 
 &
 
 Bird. The Special Master noted in his October 13, 1999 Report and Recommendation that Gilley, David, and Kirkpatrick, the three Aston
 
 &
 
 Bird attorneys handling the
 
 Bush Ranch
 
 litigation, had full knowledge of all the facts but were not presented at the hearing by DuPont, and DuPont made no attempts to obtain their testimony or explanations through depositions or other alternative methods.
 
 See
 
 October 13, 1999 Report and Recommendation, p. 11. Thus, it is uncontrovert-ed that Gilley knew of the privilege waiver over the Ata documents in the
 
 Bush Ranch
 
 case, yet communicated to Pittman when he was preparing the
 
 Kawamata
 
 log that the documents were protected. The Special Master noted that Pittman testified that he accepted Gilley’s representations as true and that, had he known Ata had been listed as a fact witness and that the Ata data had been offered to plaintiffs counsel during the
 
 Bush Ranch
 
 trial, he would have advised the Hawaii court. Without more, this testimony does not dispel the
 
 prima facie
 
 case of intentional and fraudulent misconduct by DuPont with respect to the representations made in the Hawaii privilege logs created by Gilley’s misconduct. As an attorney employed by DuPont and acting within the scope of her employment, it was proper to impute the knowledge and intent of Gilley and the other Aston & Bird attorneys to DuPont.
 
 [8]
 
 Likewise, this court also finds that the intent and knowledge of Dr. Frank, corporate counsel for DuPont, whom the Hawaii court found had intentionally testified falsely with respect to the Ata
 
 Bush Ranch
 
 documents, can properly be imputed to DuPont. The imputation of these acts to DuPont was essentially what the Special Master was doing on page 14 of the October 13,1999 Order when he stated that the knowledge of in-house counsel, who was charged with monitoring the eases, could be imputed to DuPont. While the addition of this step is not necessary to hold DuPont responsible for the fraudulent conduct and intent of Gilley and Frank, it does not change the results of the analysis.
 

 DuPont takes issue with the Special Master’s finding that David, upon his appearance in the Hawaii proceeding on
 
 *1297
 
 March 8, 1994, is charged with knowledge of all that occurred in the Hawaii litigation, and David’s knowledge of what went on in the
 
 Bush Ranch
 
 proceedings is imputed to the Hawaii attorneys. This court concurs with the findings of the Special Master that David, and thus DuPont, should have disclosed information about the waiver of privilege in Georgia after David joined the Hawaii case. Lack of such a disclosure provides evidence of DuPont’s ongoing fraud. DuPont also disputes the Special Master’s findings with respect to Mr. Shomper, in-house counsel for DuPont responsible for the
 
 Bush Ranch
 
 case. Based on Shomper’s position as supervisor of the
 
 Bush Ranch
 
 trial and coordinator of the waiver issue, his attendance at the
 
 Bush Ranch
 
 trial, his daily contact with the
 
 Bush Ranch
 
 trial attorneys, and his involvement with Crowell
 
 &
 
 Moring attorneys and Alston & Bird attorneys Kirkpatrick and David on the Alta testing work product issues, it was not clear error for the Special Master to conclude that Shom-per should have known about the waiver and should have communicated this information to Passante.
 

 DuPont argues that the Special Master’s theories of fraud with respect to David and Shomper are contrary to law because they do not implicate any conscious, deliberate wrongdoing by either of those two parties. DuPont argues that fraud requires a finding of specific intent, and that state of mind must be possessed by at least one of the corporations agents to impute that knowledge to the corporation. Indeed, “if recovery is sought on the ground of fraud, all the necessary elements going to make up fraud at common law or under a statute defining fraud, must appear, including fraudulent intent, reliance on the false statements, and injury from them.” 3 Fletcher,
 
 Fletcher Cyclopedia
 
 at § 1143
 
 (citing Alsup v. Your Graphics Are Showing, Inc.,
 
 531 So.2d 222 (Fla. 2d DCA 1988);
 
 Bernard Marko & Assoc., Inc. v. Steele,
 
 230 So.2d 42 (Fla. 3d DCA 1970)). The knowledge necessary to form the requisite fraudulent intent must be possessed by at least one agent and cannot be inferred and imputed to a corporation based on disconnected facts known by different agents.
 
 See Adams v. Natl Bank of Detroit,
 
 444 Mich. 329, 508 N.W.2d 464, 480 (1993);
 
 Woodmont, Inc. v. Daniels,
 
 274 F.2d 132, 137 (10th Cir.1959).
 

 Even if this court were to find that the Special Master erred in suggesting the imputation of David’s or Shomper’s knowledge as unrebutted themes that would implicate application of the crime/ fraud exception, there is adequate alternative evidence that DuPont did not rebut and that warrants waiver of the attorney-client and work product privileges. As noted above, no evidence was presented to rebut the Hawaii court’s findings that Frank intentionally testified falsely regarding the Alta
 
 Bush Ranch
 
 documents, and no evidence was presented to rebut or explain Gilley’s intentionally fraudulent representations to Pittman regarding the waiver status of the Alta documents. Given such a record, there were adequate unrebutted findings that agents of DuPont (Gilley and Frank) had the requisite state of mind to impute fraudulent intent to DuPont.
 

 3. DuPont’s Intent
 

 DuPont argues in its third section that there is no
 
 prima facie
 
 evidence that the client, DuPont, intended to defraud the Hawaii court about the work product status of the Alta
 
 Bush Ranch
 
 documents. Essentially, DuPont argues that it should not be held responsible for the misconduct of its outside counsel when DuPont simply asked its outside counsel to comply with the court’s orders to prepare a privilege log.
 

 As noted above, the crime/fraud exception requires the disclosure of otherwise privileged communications or material obtained in the course of the attorney’s duties on the client’s behalf which are made or performed in furtherance of a crime or fraud.
 
 See Clark v. United
 
 
 *1298
 

 States,
 
 289 U.S. 1, 53 S.Ct. 465, 77 L.Ed. 993 (1933). The client’s intent is central to this inquiry.
 
 Unites States v. Soudan,
 
 812 F.2d 920, 927 (5th Cir.1986). In the case of a corporation, the knowledge and intent of an agent who commits the fraud may be imputed to the principal corporation if the agent is acting within the scope of his or her employment and in furtherance of the corporation, and the corporation authorized or acquiesced in the action.
 
 See Cox v. Administrator United States Steel & Carnegie,
 
 17 F.3d 1386, 1406-07 (11th Cir. 1994).
 

 The cases cited by DuPont are not to the contrary. For example, in
 
 In re Sealed Case,
 
 107 F.3d 46 (D.C.Cir.1997), the D.C. Circuit Court examined a situation in which the government sought to compel production of documents from a corporation based on the crime/fraud exception. The vice-president of the company had broken campaign finance laws, not long after receiving legal advice on such laws from the company’s counsel. The Court focused on the intent and action of the company, and found that there was absolutely no evidence, other than temporal proximity, that the vice-president’s solicitation of legal advice was done with the intent to commit a crime, and that there was no way of knowing if the vice-president was “on a frolic of his own.”
 
 In re Sealed Case,
 
 107 F.3d at 50. Had there been more evidence that the vice-president was acting on the company’s behalf as an agent of the company when he committed the crime, and that the privileged information was linked to the crime, it would have been permissible to apply the crime/fraud exception.
 

 The Special Master correctly surmised that the evidence in this case was sufficient to show that DuPont’s attorneys, acting in their capacity as agents of DuPont, intentionally committed discovery fraud upon the court. The Hawaii Circuit Court clearly found that Dr. George Frank, in-house counsel for DuPont and designated as the DuPont person in charge of coordinating the Benlate litigation in all cases, intentionally testified falsely before the Hawaii court in July 1993 concerning the status of the Alta
 
 Bush Ranch
 
 documents. DuPont did not present any evidence to rebut this finding, and it stands uncontroverted as proof of DuPont’s involvement in the fraud.
 
 [9]
 
 The Special Master could have justified his conclusions on Dr. Frank’s conduct alone, for the Hawaii Circuit Court’s findings in this regard
 
 *1299
 
 clearly cover DuPont’s scienter and fraudulent intent without any ambiguity of imputed knowledge. The clear pattern of concealment and misrepresentation evident before the Hawaii courts and before Judge Elliot bear on DuPont’s intent, willfulness, and motive, and relate to the credibility of its arguments.
 

 Furthermore, DuPont chose not to present any deposition, affidavit, or live witness testimony from the Alston
 
 &
 
 Bird
 
 Btish Ranch
 
 attorneys, Gilley, David, and Kirkpatrick. The Hawaii court found that these attorneys, particularly Gilley, intentionally misrepresented the status of the Alta documents to Pittman and the Hawaii courts on behalf of DuPont to avoid turning over the documents. Woolard, the then CEO of DuPont, testified in 1995 that DuPont stands behind the actions of Alston and Bird and is ultimately responsible for their actions. Accordingly, there is ample evidence on the record for the court to find that DuPont itself had the requisite knowledge and intent to commit, through its agents, the fraud upon the Hawaii and Georgia courts. DuPont’s argument that if Gilley did in fact lie intentionally, she deceived both the courts
 
 and
 
 DuPont, finds little or no actual support in the evidence, and is outweighed by the Hawaii court’s previous findings of fraud.
 

 DuPont’s attempts to characterize the Hawaii court’s findings of fraud as being solely based on Pittman’s intentional misrepresentations to the court in the December 1993 and February 1994 privilege logs distorts the plain record of these proceedings and is not accepted by this court. The Hawaii Circuit Court took notice of the 1995 Georgia
 
 Bush Ranch
 
 sanction hearing evidence in its Rule 60(b) Order
 
 [10]
 
 and, in addition to noting Frank’s misrepresentations and Gilley’s involvement in the deceptive representations and privilege logs presented to the courts, the court found that DuPont intentionally failed to accurately respond to three motions to compel between June and August, 1993, submitted an inaccurate privilege log at the end of 1993, and misrepresented the status of the Alta documents to the Hawaii courts and the Hawaii Special Master between November 1993 and February 1994. The Hawaii court found that DuPont’s pattern of concealment began in June 1993. August 22, 1996 Rule 60(b) Order, F/F p. 32. As the Hawaii court noted, DuPont
 
 *1300
 
 had “a common practice of non-production” that extended over the totality of the discovery process, and such procedures compelled the court to find DuPont responsible for the discovery abuses of its attorneys.
 
 See
 
 May 15, 1995 Amended Order Imposing Punitive Sanctions Against Defendant E.I. Du Pont De Nem-ours and Co., Inc.,
 
 Kawamata Farms, Inc. v. United Agri Products,
 
 Civ. No. 91-437 & 92-247K (Kona), Third Circuit Ct. of Hawaii, Ex. I to Plaintiffs Response. This pervasive involvement in the overall Alta document fraud belies DuPont’s claims that it did not have the requisite intent to commit the fraud, and this court finds no fault with the Special Master’s findings that a
 
 prima facie
 
 case was sufficiently presented.
 

 4. The Standard Used to Examine the Documents
 

 DuPont argues that the crime/fraud exception only applies when the court determines that the otherwise-privileged document in question was itself in furtherance of the crime or fraud, and cites
 
 In re Richard Roe, Inc.,
 
 68 F.3d 38, 40 (2d Cir.1995) in support of this standard.
 

 However, this is not the law of the Eleventh Circuit. The Eleventh Circuit holds that the party seeking to apply the exception must make a
 
 prima facie
 
 showing that a crime was committed and “that the attorney’s assistance was obtained in furtherance of the criminal or fraudulent activity or was closely related to it.”
 
 In re Grand Jury Investigation (Schroeder),
 
 842 F.2d 1223, 1226 (11th Cir.1987). Relevance alone is not sufficient to give life to the exception.
 
 See In re Federal Grand Jury Proceedings, 89-10(MIA), 938
 
 F.2d 1578, 1582-83 (11th Cir.1991).
 

 In analyzing the degree of relatedness necessary to meet the standard, the
 
 Schroeder
 
 Court stated that the purpose is to identify communications that should not be privileged because they were used to further a crime or a fraud.
 
 Schroeder,
 
 842 F.2d at 1227. Generally, the relatedness requirement “should not be interpreted restrictively.”
 
 Id.
 

 The Special Master stated in his December 22,1999 Clarification that:
 

 The relatedness standard or the amalgam of standards, is the synthesis enunciated in
 
 In re Grand Jury Investigation (Schroeder),
 
 842 F.2d 1223 (11th Cir.1987). The law of this Circuit is set forth in that case, and that synthesis was utilized by the Special Master.
 

 12/22/99 Clarification, at 2. This is the correct legal standard, and this court affirms that judgment. Moreover, upon review of the eighteen documents at issue, the court finds that the Special Master correctly found that these documents were created in furtherance of or were closely related to the fraud demonstrated by the plaintiffs
 
 prima facie
 
 case.
 

 5. Unsealing the Transcript
 

 Finally, DuPont objects to the Special Master’s recommendation in his Clarification of December 22, 1999 that the crime/fraud hearing should be unsealed. DuPont argues that there has been no showing by the plaintiff why the testimony should be discoverable independent of the fact that the testimony was given at the crime/fraud hearing, that the testimony was not in furtherance or closely related to the alleged fraud, and that unsealing the transcript would be fundamentally unfair as it would punish DuPont for trying to protect its privilege.
 

 On June 18, 1998, the Special Master entered a Protective Order Regarding Procedures Governing the Crime-Fraud Proceedings. Plaintiff agreed to abide by the non-waiver agreement.
 
 See
 
 June 26, 1998 Order of Clarification, p. 2. Under the non-waiver agreement, the deposition testimony of witnesses and the disclosure of documents in connection therewith would not constitute a waiver of any of DuPont’s or its counsel’s privileges. June 18 Order, p. 3. Furthermore, any testimony of DuPont’s witnesses and/or discovery conduct
 
 *1301
 
 ed by Plaintiffs counsel may not be revealed to outside persons, “unless and until the Court determines that such testimony or information is discoverable for reasons other than its introduction or discovery during the crime-fraud proceedings.”
 
 Id.
 
 at 5, ¶ 7(a). The Special Master’s December 22, 1999 Clarification stated that “[t]he transcript from the crime-fraud hearing should be unsealed, but the unsealing should be stayed until final determination of the crime-fraud issues by the District Court.” December 22, 1999 Clarification, p. 1. No reasons or explanation for the unsealment decision were provided by the Special Master.
 

 Plaintiff did not address this objection to the Special Master’s recommendation at all in its response. Furthermore, the Special Master failed to explain the basis for his determination that DuPont’s witnesses’ testimony is discoverable for reasons other than its introduction during the crime-fraud proceedings. Therefore, the Special Master’s recommendation on this point shall be set aside, and the transcript of the crime/fraud hearing shall remain under seal.
 

 B. Plaintiffs Objections:
 

 The Plaintiff made three objections to the Special Master’s recommendations. The court finds that none of the objections warrant setting aside any of the Special Master’s findings or recommendations.
 

 1. Denial of Plaintiffs Request for an Evidentiary Hearing
 

 Plaintiff objects to the Special Master’s April 8, 1998 Clarification, which denied plaintiffs request for an evidentiary hearing on the issue of whether DuPont was denied an opportunity to present evidence at the Rule 60(b) hearing before the Hawaii Circuit Court. Plaintiff points out the fact that in the April 1, 1998 Report and Recommendation Re: Application of Collateral Estoppel, the Master stated that “[ajlthough the Special Master has serious doubts as to whether DuPont simply made a tactical decision not to call witnesses, given the policy considerations noted above, that doubt should be resolved in DuPont’s favor.” 4/1/98 Report and Recommendation, p. 8. Plaintiff believes that this “serious doubt” warranted discovery on the issue, since plaintiff “might have learned that DuPont’s lead defense counsel in Hawaii did not believe at the time that DuPont’s defense had been prejudiced or hampered,” and the parties “could have saved ... months of wasted time.” Plaintiff Objections, p. 4.
 

 It is not clear what relief the plaintiff is seeking in making this objection other than to bolster its argument for attorney’s fees, since the crime/fraud hearing has taken place and taking discovery on this issue at this point would be moot. As noted at the beginning of this Order, the court will fully address plaintiffs arguments for attorney fees by separate order. Doing so at this time in this manner would not adequately address the issue and does not suit the court’s interests.
 

 Furthermore, review of the Special Master’s April 1, 1998 Report and Recommendation reveals that the Special Master had prudently considered plaintiffs allegations that DuPont was not actually denied the opportunity to present evidence at the Rule 60(b) hearing. After considering both argument from both sides, the Special Master determined that, in light of the indeterminacy of Hawaii case law on offensive collateral estoppel, the mandates of due process, the different claims of the parties as to whether live witnesses had been allowed in Hawaii, the requirement that a defendant have a full and fair hearing, and the serious consequences of invading the attorney-client privilege, defendant should be given a limited opportunity to supplement the record to rebut the
 
 prima facie
 
 case. 4/1/98 Report and Recommendation, p. 7. The court finds that this decision was properly made at the time, and that plaintiffs papers have not demonstrated any valid reason to set aside the Special Master’s subsequent decision to
 
 *1302
 
 deny a more particularized evidentiary hearing on the issue of whether DuPont was denied an adequate opportunity to defend itself in the
 
 Kawamata
 
 Rule 60(b) hearing.
 

 2. Plaintiffs Use of Record Developed in the Crime-Fraud Proceedings
 

 Plaintiff objects to the statement within the Special Master’s June 18, 1998 Protective Order Regarding Procedures Governing the Crime-Fraud Proceedings that “for the remainder of this case (outside of the crime-fraud hearings), Plaintiff will not be able to use any information developed during the crime-fraud hearings that the Court determines is non-discoverable, unless and until there is a contrary ruling.” 6/18/98 Protective Order, p. 5, ¶ 7(b). Plaintiff argues (a) that this result is highly inequitable since the entire record was developed on DuPont’s insistence so that DuPont could use the evidence offensively to rebut plaintiffs
 
 prima facie
 
 showing of fraud, and (b) that the record relates to and is highly probative of the
 
 prima facie
 
 case of fraud that plaintiff will seek to establish at trial. Additionally, plaintiff argues that it should be permitted to utilize the “fairness” documents that the Special Master ordered produced at the hearing to assure the completeness of the subject matter inquiry in its case in chief.
 

 Plaintiff has not presented any case law, and its argument is based strictly on general references to the equities of the situation. Under the express terms of the Special Master’s Protective Order, the crime/ fraud hearing record could be used upon order of the court, if “the Court determines that such testimony or information is discoverable for reasons other than its introduction or discovery during the crime-fraud proceedings.” The plaintiff has not presented any showing that the information is relevant for any other reasons independent of the fact that the record was developed at the crime/fraud proceedings.
 

 Moreover, the Special Master has reviewed all of the fairness documents presented at the crime/fraud hearing under the
 
 Schroeder
 
 in furtherance of or closely related to test, and recommended that only five documents be produced. Plaintiff has not demonstrated why the court should disturb that finding, and the court declines to do so here based purely on speculation. The standards of ‘relevant to the subject matter inquiry’ and ‘in furtherance of or closely related to the crime or fraud’ are decidedly different, and the Special Master was correct to differentiate his review of the documents under each standard.
 

 3. Documents Found Not to be Discoverable
 

 Plaintiff argues that it was error for the Special Master to withdraw his November 2, 1999 recommendation that Documents 28, 45, 66E, and 66Z (or portions thereof) be produced. Plaintiff appears to concede that these four documents were not part of the January 17, 1997 log (the only log at issue in these proceedings), but would have the court order the documents produced anyway because the Special Master had reviewed the documents and found them to be sufficiently related to the Hawaii proceedings.
 

 This court fails to see any error in the Special Master’s decision to limit his recommendation to documents in the log that was at issue in these hearings. It would be beyond the scope of the proceedings for the Special Master to order production of documents not on the log, and his clarification was proper.
 

 V. Conclusion
 

 The court has reviewed both parties’ objections to the Special Master’s reports and recommendations regarding the crime/ fraud exception, and finds that all of the objections should be denied except for DuPont’s objection to the Special Master’s recommendation that the crime/fraud hearing transcript should be unsealed.
 
 *1303
 
 Plaintiff, through its motion to compel, established a
 
 prima facie
 
 case that DuPont had intentionally committed discovery fraud upon the court and that the crime/fraud exception should be applied to vitiate DuPont’s claim of attorney-client and work product privilege with respect to documents related to the Alta
 
 Bush Ranch
 
 documents. DuPont was provided an.opportunity to present testimony it claimed to have been denied the opportunity to present in the Hawaii Circuit Court’s Rule 60(b) hearing and to rebut the
 
 prima facie
 
 case, but was unable to show by a preponderance of the evidence that the
 
 prima facie
 
 case should not be accepted. Therefore, the Special Master examined the documents sought to be produced under the second prong enunciated in
 
 Schroeder
 
 (requiring that the attorney’s assistance was obtained in furtherance of the fraud or was closely related to it), and correctly found that eighteen documents should be produced to the plaintiff.
 

 This opinion has carefully analyzed the entire
 
 prima facie
 
 case of fraud, including the decisions by the Hawaii circuit court, the Hawaii Supreme Court, the Georgia district court, and the Eleventh Circuit, and finds that the crime/fraud exception should be applied in this case. Henceforth, documents sought to be produced under the crime/fraud exception shall be carefully scrutinized
 
 in camera
 
 by the Special Master to determine whether they were produced in furtherance of or are closely related to the unrebutted
 
 prima facie
 
 Alta
 
 Bush Ranch
 
 document fraud case that is set forth in this Order.
 

 Accordingly, it is
 

 ORDERED AND ADJUDGED that all of the Special Master’s Reports and Recommendations Re: the Crime/Fraud Exception are AFFIRMED except for the recommendation in the December 22, 1999 Clarification that the crime/fraud hearing transcript should be unsealed. The transcript shall remain sealed. Either party may move before the Special Master to have the transcript unsealed, after which the Special Master shall provide a report and recommendation as to why the transcript should be discoverable for reasons other than the information’s introduction or discovery during the crime/fraud proceedings. It is further
 

 ORDERED AND ADJUDGED that production of documents and implementation of the reports and recommendations shall be stayed twenty (20) days to provide the parties with an opportunity to seek additional review and stay with the Eleventh Circuit Court of Appeals.
 

 [1]
 

 . The orders and reports and recommendations that make up the Special Master's combined reports and recommendations regarding the crime/fraud exception consist of:
 

 (1) Order on Plaintiff's Motion to Compel Re: Crime/Fraud Exception, January 13, 1998, D.E. 211;
 

 (2) Report and Recommendation Re: Application of Collateral Estoppel, April 1, 1998, D.E. 229;
 

 (3) Special Master’s Clarification of April 1, 1998 Report and Recommendation, Apr. 8, 1998, D.E. 232;
 

 (4) Protective Order Regarding Procedures Governing the Crime-Fraud Proceedings, June 18, 1998, D.E. 249;
 

 (5) Order of Clarification of Special Master's June 18, 1998 Report and Recommendation, June 26, 1998, D.E. 254;
 

 (6) Special Master’s Additional Clarification of June 18, 1998 Report and Recommendation, July 10, 1998, D.E. 260;
 

 (7) Report and Recommendation Re: Appropriate Evidentiary Standard Re: Crime-Fraud Motion, December 1, 1998, D.E. 275;
 

 (8) Report and Recommendation Re: Plaintiff's Motion to Supplement the Record Re:
 
 *1280
 
 His Pending Crime-Fraud Motion, December 4, 1998, D.E. 277;
 

 (9) Stipulated Order, December 4, 1998, D.E. 280;
 

 (10) Report and Recommendation Regarding Procedures for Depositions of Witnesses Re: Crime-Fraud Hearing, January 8, 1999, D.E. 281;
 

 (11) Joint Stipulation and Order re: non-waiver agreement, January 13, 1999, D.E. 284;
 

 (12) Special Master’s Report and Recommendation on Motion to Clarify His January 8, 1999 Report and Recommendation, January 15, 1999, D.E. 285;
 

 (13) Special Master’s Report and Recommendation Re: Production of Documents for Depositions, January 27, 1999, D.E. 286;
 

 (14) Special Master's Report and Recommendation Regarding Objections of Parties to Non-Production of Documents Prior to Depositions on the Crime-Fraud Issue, February 16, 1999, D.E. 290;
 

 (15) Special Master’s Report and Recommendation Re: Plaintiff's Motion to Compel Documents Pursuant to Court’s October 26, 1998 Order, May 7, 1999, D.E. 302;
 

 (16) Report and Recommendation Re: Subpoenas to Crowell & Moring and Alston & Bird, May 7, 1999, D.E. 303;
 

 (17) Report and Recommendation Re: an Amended Pretrial Schedule, May 28, 1999, D.E. 307;
 

 (18) Report and Recommendation Re: Production of Additional "Fairness” Documents, May 28, 1999, D.E. 308;
 

 (19) Clarification of Special Master’s Report and Recommendation of May 28, 1999 Re: "Fairness” Documents, June 11, 1999, D.E. 309;
 

 (20) Report and Recommendation that the Subpoena Issued to Alston & Bird be Quashed, September 24, 1999, D.E. 331;
 

 (21) Report and Recommendation Re: DuPont's Failure to Rebut
 
 Prima Facie
 
 Showing of Crime-Fraud Exception, October 13, 1999, Under Seal;
 

 (22) Special Master's Report and Recommendation Re: Disclosure of Documents Under Second Prong of Crime-Fraud Exception, November 2, 1999, D.E. 337;
 

 (23) Revised Report and Recommendation Re: Disclosure of Documents in Connection With Crime-Fraud Hearing, November 16, 1999, Under Seal;
 

 (24) Special Master's Clarification of His November 16, 1999 Report and Recommendation, December 22, 1999, Under Seal.
 

 The court withheld ruling on objections to the Special Master's reports and recommendations until an ultimate determination of the merits of plaintiff's motion to compel was reached. Accordingly, DuPont filed objections to the reports listed above as numbers (7), (21), (23), and (24), and Plaintiff filed objections to reports (3), (4), and (24). Any objections not raised in the parties' Objections to the Special Master's Reports and Recommendations filed on January 21, 2000 are deemed waived by the court.
 

 [2]
 

 . The parties' agree that the analysis here applies equally to the work product privilege as well as the attorney-client privilege. This Order, therefore, makes no distinction in its review. While generally immune from discovery, attorney work product loses its protected status if it relates to efforts to facilitate a crime or fraud, or to conceal illegal conduct, obstruct justice, or subvert the legal system.
 
 See generally Clark v. United States,
 
 289 U.S. 1, 15, 53 S.Ct. 465, 77 L.Ed. 993 (1933).
 

 [3]
 

 . The class was certified as all persons or entities who purchased E.I. Dupont De Nem-ours and Company common stock during the period from June 19, 1993 through and including January 27, 1995, excluding Defendants, members of the immediate family of Defendant Edgar J. Woolard, Jr., any entity in which any Defendant has a controlling interest, and the legal representatives, affiliates, heirs, successors, predecessors in interest, or assigns of any Defendant (the "Class”).
 
 See
 
 Order, 4/1/97, D.E. 150.
 

 [4]
 

 . The Hawaiian Third Circuit Court considered the complete transcripts of Judge Elliot’s hearing to address allegations of fraud committed by Du Pont in the
 
 Bush Ranch
 
 cases with regard to the
 
 Bush Ranch
 
 Alta documents. It also considered Judge Elliot's Opinion and Order. It found that the Georgia May, 1995 fraud hearing and Judge Elliot’s August 21, 1995 Opinion and Order were relevant to Dupont’s conduct and representations to the Hawaii Courts with respect to the
 
 Bush Ranch
 
 Alta documents. See August 19, 1996 Order, Findings of Fact, §§ 23 to 25. As noted below, this Court also considers those findings important to these proceedings and relevant to Du Pont's arguments here in opposition to the Special Master's Reports and Recommendations.
 

 [5]
 

 . The Special Master's January 13, 1998 Order made the following findings to support the
 
 prima facie
 
 case:
 

 In
 
 Kawamata Farms, Inc. v. DuPont,
 
 Case No. 19201 (Hawaii S.Ct.1997), the Court made these findings,
 
 inter alia:
 
 DuPont made fraudulent representations to the Circuit Court regarding production of Alta
 
 Bush Ranch
 
 documents (p. 21); DuPont falsely represented to the Circuit Court that it had previously asserted the work product privilege with respect to the Alta
 
 Bush Ranch
 
 documents in other Benlate-related cases (p. 85). The [Hawaii Supreme] Court implicitly adopted the Hawaii Circuit Court's findings of fact and conclusions of law, among which were the following:
 

 (1) On June 15, 1993, Dr. David Johnson, a DuPont chemist, first contacted Alta to do a soil analysis. He was assisting DuPont
 
 Bush Ranch
 
 counsel and made the call from Alston & Bird's conference room (p. 6).
 

 (2) Dr. Johnson trained attorneys Kirkpatrick, Gilley and David in using and interpreting the Alta data (p. 7).
 

 (3) David was admitted Pro Hac Vice in the
 
 Kawamata
 
 case in February, 1994 (p. 7).
 

 (4) Alta was named as a fact witness in the
 
 Bush Ranch
 
 case and the
 
 Kawamata
 
 case (p. 7).
 

 (5) During the week of June 19, 1993, Gilley and David learned from Alta that the laboratory had detected suspected positive findings of SU's in the
 
 Bush Ranch
 
 soil (p. 8-9).
 

 (6) Robert Betham of Alta recognized this as "potentially bad news” for DuPont (p. 10).
 

 (7) On July 7, 1993, Dr. George Frank testified in the
 
 Kawamata
 
 case for DuPont that there was no ongoing 1993 testing. Even if Dr. Frank was unaware of the 1993 testing, DuPont had designated him to testify, and the tests were conducted by Alta, hired by DuPont (p. 11-12).
 

 (8) On August 4, 1993, Kirkpatrick and Gilley waived any work product privilege claim as to the Alta data and made them available in court to the
 
 Bush Ranch
 
 plaintiffs. David concurred that DuPont was not asserting a work product privilege as to the Alta documents (p. 15-17).
 

 (9) On November 15, 1993, DuPont’s counsel in the
 
 Kawamata
 
 case maintained that Alta lab test results in other cases were protected by the work product privilege. Thereafter, DuPont's national coordinating counsel, Jonathan Pittman, prepared a privilege log, and stated in an affidavit that only local counsel in each case would know which documents were subject to the privilege. He identified Gilley as local counsel in the
 
 Bush Ranch
 
 case (p. 19-20).
 

 (10) Pittman's affidavit failed to note DuPont's
 
 Bush Ranch
 
 counsel's actions regarding the non-privileged status of the Alta
 
 *1286
 
 documents on August 4, 1993 in the
 
 Bush Ranch
 
 court. The Circuit Court found this to be misleading and an intentional concealment of potentially relevant information relating to Benlate and soil SU contamination (p. 21-22).
 

 (11) On November 19, 1993 and in January, 1994, DuPont represented to the Court in the
 
 Kawamata
 
 case that it had never waived the work product privilege as to the SU testing conducted in other jurisdictions and it had never been produced or proffered to any other party in any other Ben-late case (p. 23).
 

 (12) The Circuit Court would have admitted certain statements and documents as evidence of a common scheme or plan by DuPont to conceal SU soil contamination (p. 32-33).
 

 (13) When national coordinating counsel Pittman prepared the privilege log, he knew it was giving a false impression as to the status and history of the Alta documents because he had communicated with Gilley before the log was prepared (p. 41).
 

 Furthermore, as noted by the Special Master, the fact that the Eleventh Circuit, in
 
 In re E.I Du Pont De Nemours and Co.-Benlate Litigation,
 
 99 F.3d 363 (11th Cir.1996), reversed Judge Elliot’s August 21, 1995 sanction order in the
 
 Bush Ranch
 
 litigation does not render the evidence adduced in proceedings before Judge Elliot invalid.
 
 See
 
 Edna Selan Epstein,
 
 The Attorney-Client Privilege and the Work-Product Doctrine
 
 263 (3d ed. 1997) ("[T]he fact that no reliance can be placed on the outcome of reversed or invalidated proceedings, standing alone, does not mean that evidence adduced in those proceedings cannot be used to make the requisite showing [of crime or fraud].”) The Hawaii courts properly relied on testimony and transcripts from the sanction hearings before Judge Elliot in finding that DuPont had committed discovery fraud upon the circuit court and the parties, and so may this court.
 

 [6]
 

 . "F/F” and "C/L” refer respectively to Judge Ibarra’s Findings of Fact and Conclusions of Law in his Rule 60(b) decision.
 

 [7]
 

 . This is consistent with the general rule that the burden of proof to establish the existence of the attorney-client privilege rests on the party who claims the privilege.
 
 See In re: Grand Jury Investigation (Schroeder),
 
 842 F.2d 1223, 1225 (11th Cir. 1987).
 

 [8]
 

 . Moreover, the record indicates that DuPont accepted legal responsibility and liability for its outside counsel’s knowledge and conduct. At the
 
 Bush Ranch
 
 sanctions hearing in 1995, Woolard, DuPont’s then CEO, testified that he took full responsibility for DuPont, its attorneys and scientists. The Hawaii Circuit Court adopted these findings in its Rule 60(b) Order.
 

 [9]
 

 . The Hawaiian Third Circuit Court found in its August 19, 1996 Order: “Dr. George Frank’s representations to this Court and Plaintiffs that '... We have no ... ongoing 1992 testing was incorrect. DuPont knew its agent, ALTA Laboratories was conducting testing at the very same time Dr. Frank told this Court and Plaintiffs under oath that no such testing existed. As corporate counsel designated by DuPont to testify to this Court in all Benlate cases, this Court finds that DuPont knew about the ALTA Labs testing notwithstanding what Dr. Frank testified. DuPont is charged with the knowledge of hiring its designated agent ALTA Lab.” Finding of Fact 12, at Page 38. It further found: "... this Court finds by clear and convincing evidence that DuPont committed fraud when Dr. Frank represented to this Court and the Plaintiffs that there was no ongoing 1993 testing,” and "DuPont has provided this Court no explanation whatsoever how Dr. Frank could make the above representations to this Court and the Plaintiffs on July 7, 1993 in view of the ongoing research at ALTA Labs as described in the above Findings of Fact.”
 
 Id.
 
 at page 39.
 

 It is of note that Judge Elliot reached the same conclusion regarding Dr. Frank. He found: "By way of preface, the Court notes that DuPont’s prior non-compliance with the Court's discovery orders is exemplified by the fact that Mr. George Frank, DuPont’s corporate counsel, submitted an affidavit on behalf of DuPont on January 4, 1993, wherein he certified to the Court that DuPont had fully complied with this Court’s orders in that full production of documents had been made pursuant to the Plaintiffs’ first requests for production even through he testified on cross-examination at the May 27 hearing that he never read through those requests. The Court finds such conduct to be typical of the Defendant’s attitude toward discovery throughout the history of this case.”
 
 In re E.I. du Pont de Nemours,
 
 918 F.Supp. at 1530-31.
 

 [10]
 

 . Judge Elliot entered a number of important findings pertinent to this Court’s review and which were considered as well by the Hawaiian courts. He found in
 
 In re E.I. du Pont de Nemours and Co.,
 
 918 F.Supp. 1524 (M.D.Ga.1995): (i) “The conduct and strategy of DuPont in the discovery process was controlled either through its in-house counsel, national coordinating counsel, or Wilmington, Delaware, counsel and not solely by Alston Bird or other local counsel, and DuPont continues to knowingly approve, ratify and acquiesce in the past and present conduct of its counsel in this and subsequent Benlate cases. DuPont, through its corporate officers and other officials, ratified, approved, and adopted this conduct and strategy and caused the same to be used by counsel representing DuPont in Benlate cases all across the country,”
 
 id.
 
 at 1533; and (ii) “In the proceedings before this Court on the show cause order, the Court finds that DuPont, when confronted with the allegations of the petition, which were supported by transcripts from other court proceedings, depositions, and court orders, has not fully and truthfully responded to those charges. Instead, it has engaged in evasion, equivocation, and falsehood; through its witnesses such as Mr. David and Ms. Gilley, DuPont refused to give straightforward answers to questions about its conduct in regard to the Alta documents and its positions before other courts, refused to give words their plain and ordinary meanings, and refused to respond candidly or directly; it has sought to give a distorted reading to the plain meaning of words; it has created a whole series of after-the-fact excuses which are not supported by the facts and events; it has put forward legally and factually inconsistent efforts at justifying its conduct; it has contradicted its own solemn representations to other courts, made to induce those courts to rule favorably to DuPont; it has resisted producing witnesses before this Court who have knowledge of the facts, and those witnesses who did testify for DuPont were not credible; it has sought to avoid answering for its conduct making irrelevant ad hominem attacks on Petitioners, Petitioners’ counsel, and the Court ...,”
 
 id.
 
 at 1539-40 (emphasis added).